UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | |
|---|---|
| **MARVIN DEWAYNE HENDERSON,**<br><br>Plaintiff,<br><br>v.<br><br>**CAROLYN W. COLVIN,**<br>**Commissioner of the**<br>**Social Security Administration,**<br><br>Defendant. | Case No.: 4:14-cv-02141-MHH |

## **MEMORANDUM OPINION**

Pursuant to 42 U.S.C. § 405(g), plaintiff Marvin Dewayne Henderson seeks judicial review of a final adverse decision of the Commissioner of Social Security. The Commissioner denied Mr. Henderson's claim for disability insurance benefits. After careful review, the Court affirms the Commissioner's decision.

**I.   PROCEDURAL HISTORY**

Mr. Henderson applied for disability insurance benefits on October 20, 2011. (Doc. 5-6, p. 13).  Mr. Henderson alleges that his disability began on December 23, 2005.  (Doc. 5-6, p. 13).  The Commissioner initially denied Mr. Henderson's claim on December 6, 2011.  (Doc. 5-5, p. 2).  Mr. Henderson requested a hearing before an Administrative Law Judge (ALJ).  (Doc. 5-5, p. 12).  The ALJ issued an

unfavorable decision on March 7, 2013.  (Doc. 5-3, pp. 15-24).  On September 4, 2014, the Appeals Council declined Mr. Henderson's request for review (Doc. 5-3, p. 2), making the Commissioner's decision final and a proper candidate for this Court's judicial review.  *See* 42 U.S.C. § 405(g).

## II.   STANDARD OF REVIEW

The scope of review in this matter is limited.  "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," the Court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close scrutiny.'"  *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

The Court must determine whether there is substantial evidence in the record to support the ALJ's findings.  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  In making this evaluation, the Court may not "decide the facts anew, reweigh the evidence" or substitute its judgment for that of the ALJ.  *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted).  If the ALJ's decision is supported by substantial evidence, the Court "must affirm even if the evidence preponderates against the

Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, the Court must determine whether the ALJ applied the correct legal standards. If the Court finds an error in the ALJ's application of the law, or if the Court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the Court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## III.   SUMMARY OF THE ALJ'S DECISION

To determine whether a claimant has proven that he is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel*, 631 F.3d at 1178.

In this case, the ALJ found that Mr. Henderson did not engage in substantial gainful activity from December 23, 2005, the alleged onset date, through September 30, 2011, the date on which Mr. Henderson was last insured. (Doc. 5-3,

p. 17).   The ALJ determined that Mr. Henderson suffers from the severe impairment of "status post right hand amputation below the elbow."  (Doc. 5-3, p. 17).   The ALJ also noted that Mr. Henderson has the following non-severe impairments:  low back strain, mild degenerative disc disease, depression, and anxiety.  (Doc. 5-3, pp. 18-19).  Based on a review of the medical evidence, the ALJ concluded that Mr. Henderson does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Doc. 5-3, pp. 19-20).

Next, the ALJ evaluated Mr. Henderson's residual functional capacity in light of his impairments.  The ALJ determined that through the date last insured, Mr. Henderson had the residual functional capacity to:

> perform light work as defined in 20 CFR 404.1567(b) except that he cannot push/pull with the right upper extremity.  He is also unable to engage in gross or fine manipulation (handling, finger, or feeling) with the right upper extremity.  He can frequently climb ramps and stairs but never climb ladders, ropes, or scaffolds.  He can frequently balance, stoop, kneel, and crouch but only occasionally crawl. He should avoid operation and control of hazardous and moving machinery and should also avoid exposure to unprotected heights. [Mr. Henderson's] right arm can be used for guiding and supporting.

(Doc. 5-3, p. 20).  Based on this RFC, the ALJ concluded that through the date last insured, Mr. Henderson was unable to perform his past relevant work as a press operator.  However, relying on testimony from a vocational expert, the ALJ found that through the date last insured, jobs existed in the national economy that Mr.

Henderson could perform, including cashier, ticket seller/taker, and cleaner. (Doc. 5-3, pp. 22-23). Accordingly, the ALJ determined that Mr. Henderson is not disabled within the meaning of the Social Security Act. (Doc. 5-3, p. 24).

## IV. ANALYSIS

Mr. Henderson argues that he is entitled to relief from the ALJ's decision because the ALJ failed to properly consider the opinion of treating physician, Dr. Paul Sykes, and because the ALJ failed to properly apply the Eleventh Circuit pain standard. The Court examines each issue in turn.

### A. Substantial evidence supports the ALJ's decision to give little weight to the opinion of Dr. Sykes.

The ALJ "must state with particularity the weight given to different medical opinions and the reasons therefor." *Winschel*, 631 F.3d at 1179. "Absent good cause, an ALJ is to give the medical opinions of treating physicians substantial or considerable weight." *Id.* (internal quotation marks and citations omitted). Good cause exists when "(1) [the] treating physician's opinion was not bolstered by the evidence; (2) [the] evidence supported a contrary finding; or (3) [the] treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004); *see also Crawford*, 363 F.3d at 1159. "With good cause, an ALJ may disregard a treating physician's opinion, but he must clearly articulate the reasons for doing so." *Winschel*, 631 F.3d at 1179 (internal quotation marks and citation omitted).

In this case, the ALJ articulated specific reasons for affording Dr. Sykes's opinion little weight. The ALJ stated that Dr. Sykes's opinion "is inconsistent with the doctor's own treatment records of the claimant, inconsistent with the claimant's travels abroad during the time he was being treated by Dr. Sykes, and inconsistent with the claimant's functional independence in his activities of daily living." (Doc. 5-3, p. 22). Substantial evidence supports this determination.

Dr. Sykes completed a physical capacities evaluation (PCE) form for Mr. Henderson on January 27, 2012. (Doc. 5-8, p. 77). Dr. Sykes indicated that Mr. Henderson can lift and carry 10 pounds occasionally or less frequently, sit for up to 8 hours, stand or walk for up to 8 hours, and occasionally perform pushing and pulling, climbing, fine and gross manipulation, bending and reaching. (Doc. 5-8, p. 77). According to Dr. Sykes, Mr. Henderson can operate a motor vehicle, but he cannot work around hazardous machinery or stoop. (Doc. 5-8, p. 77).

Dr. Sykes also completed a clinical assessment of pain (CAP) form on January 27, 2012. (Doc. 5-8, pp. 78-79). Dr. Sykes opined that Mr. Henderson has pain that is distracting to adequate performance of daily activities and work, that physical activity would cause greatly increased pain, and that Mr. Henderson has some side-effects from medication but not to such a degree as to create serious problems in most instances. (Doc. 5-8, pp. 78-79).

Mr. Henderson first saw Dr. Sykes on August 9, 2011.  (Doc. 5-8, p. 63).  Mr. Henderson complained that he had experienced phantom limb pain since 2006 after doctors amputated his right hand in 2005.  Mr. Henderson had just returned from an extended visit to the Philippines, and he was re-establishing residency in the Birmingham, Alabama area.   (Doc. 5-8, p. 63).  Mr. Henderson reported that his pain was constant, but the intensity of the pain varied.  Dr. Sykes found that Mr. Henderson had good range of motion at the right elbow and allodynia, or a painful sensation, in the right forearm to light touch.  (Doc. 5-8, p. 63).  Mr. Henderson had full strength in his upper left arm and both lower extremities.  His gait was steady and unstressed.   (Doc. 5-8, p. 63).  Dr. Sykes instructed Mr. Henderson to continue using his TENS unit for pain relief, and Dr. Sykes increased Mr. Henderson's Gabapentin dosage.  Dr. Sykes asked Mr. Henderson to return in six to eight weeks. (Doc. 5-8, p. 63).

On October 14, 2011, Mr. Henderson saw Dr. Sykes again.  (Doc. 5-8, p. 62).  Mr. Henderson was scheduled to return to the Philippines for about three weeks to announce his engagement with his fiancé's family.  (Doc. 5-8, p. 62).  Mr. Henderson reported that his TENS unit and medication were somewhat helpful in relieving his pain.  (Doc. 5-8, p. 62).  Mr. Henderson intermittently used Pritiq to help his mood.  Mr. Henderson explained that he was planning to start school to become a pharmacy technician.  (Doc. 5-8, p. 62).

During the October 2011 visit, Dr. Sykes found that with the exception of his upper right extremity, Mr. Henderson had full strength. His gait was steady and unstressed. Dr. Sykes noted that Mr. Henderson was awake, alert, and in no acute distress. (Doc. 5-8, p. 62). Dr. Sykes recommended that Mr. Henderson take Pristiq as prescribed because Dr. Sykes believed the medication might help with Mr. Henderson's neuropathic pain and his mood swings. Dr. Sykes refilled Mr. Henderson's Gabapentin and added Baclofen. Dr. Sykes instructed Mr. Henderson to follow up in two to three months. (Doc. 5-8, p. 62).

On January 16, 2012, Mr. Henderson reported to Dr. Sykes that he was "doing okay on the whole." (Doc. 5-8, p. 61). Mr. Henderson had just returned from the Philippines and was engaged. He was having some panic attacks and anxiety, but he was not using Pristiq as Dr. Sykes had ordered. Upon examination, Mr. Henderson had "[f]ull strength in all 4 extremities except for right upper extremity. . . ." (Doc. 5-8, p. 61). Mr. Henderson's gait was steady and unstressed. (Doc. 5-8, p. 61). Dr. Sykes instructed Mr. Henderon to resume Pristiq, participate in an exercise program, and follow up in four months. (Doc. 5-8, p. 61).

On May 16, 2012, Mr. Henderson reported to Dr. Sykes that his medication had helped his symptoms. (Doc. 5-8, p. 60). Mr. Henderson reported no side effects or sedation from the medication. Mr. Henderson explained that he was in

8

the process of making arrangements for his fiancé to move to the United States. Dr. Sykes recorded unremarkable examination findings other than Mr. Henderson's strength in his right upper extremity. Dr. Sykes continued Baclofen and Pritiq and instructed Mr. Henderson to return in six months. (Doc. 5-8, p. 60).

Dr. Sykes's treatment records suggest that Mr. Henderson responded to pain medication. Mr. Henderson was able to spend several months out of the country. Dr. Sykes suggested that Mr. Henderson exercise. With the exception of his right upper extremity, Mr. Henderson consistently demonstrated a full range of motion in all extremities, and his gait was normal. The record contains no evidence suggesting that Mr. Henderson's pain was so extreme that he required follow-up visits other than the visits that Dr. Sykes recommended every three to six months. Mr. Henderson's desire to return to school to become a pharmacy technician suggests that he considers himself capable of attending classes and finding employment.

Moreover, until he became engaged in 2012, Mr. Henderson lived alone and cared for all of his personal needs. Mr. Henderson testified that he could perform household chores and cook. (Doc. 5-3, p. 47). Mr. Henderson cleans, does laundry, dusts, washes dishes, and takes out the trash. (Doc. 5-7, p. 44). Mr. Henderson also indicated that he has no trouble writing with a pen or pencil, typing on a keyboard, or grasping and turning a doorknob. (Doc. 5-7, p. 41).

Dr. Sykes's evaluation of Mr. Henderson in the PCE and CAP forms is inconsistent with Dr. Sykes's treatment records and the evidence regarding Mr. Henderson's daily activities. Thus, the Court finds good cause to give less weight to the PCE and CAP forms that Dr. Sykes completed; the ALJ's decision is supported by substantial evidence. *See e.g.*, *Phillips*, 357 F.3d at 1241 (substantial evidence supported the ALJ's decision to give less weight to the treating physician's opinion because the treating physician's assessment conflicted with his treatment notes and the claimant's testimony regarding her daily activities); *Crawford*, 363 F.3d at 1159-61 (finding that substantial evidence supported the ALJ's decision to discredit the opinions of the claimant's treating physicians where those physicians' opinions regarding the claimant's disability were inconsistent with the physicians' treatment notes); *see also Evans v. Comm'r of Soc. Sec. Admin.*, 551 Fed. Appx. 521, 524 (11th Cir. 2014) (substantial evidence supported the ALJ's decision to reject the treating physician's opinion because the opinion was not supported by the physician's medical findings and was inconsistent with the claimant's self-reported daily activities, which included various household chores, driving, shopping, and visiting with friends and family).

As part of his argument concerning the ALJ's treatment of Dr. Sykes's opinion, Mr. Henderson cites a January 2, 2013 report from Dr. Matthew Berke. (Doc. 7, p. 6). Dr. Berke examined Mr. Henderson at Dr. Sykes's request. (Doc.

5-9, p. 12).  Mr. Henderson complained of "significant symptoms of aching, numbness, pins and needles, burning, stabbing, and hypersensitivity."  (Doc. 5-9, p. 12).  Mr. Henderson rated his pain as a 10 on a 10-point pain scale.  Dr. Berke noted that Mr. Henderson had a history of epidural blocks that provided little relief and that Mr. Henderson had visited a pain clinic.  Dr. Berke also noted that Mr. Henderson's TENS unit did not help relive his pain.  Dr. Berke reviewed an MRI that revealed "mild narrowing of the right C4-5 neural foramen secondary to mild lateral disc bulge." (Doc. 5-9, p. 12).

    Dr. Berke found that Mr. Henderson had a painful range of motion of the cervical spine with left and right rotation and giveaway weakness with right elbow flexion and sensitivity to light touch.  Mr. Henderson's left upper extremity strength was 5/5.  Dr. Berke concluded that Mr. Henderson "appears to have significant complex regional pain syndrome w[ith] phantom limb pain.  [Mr. Henderson's] pain is poorly compensated for an[d] is not [responsive] to medications or injections.  This is a very difficult problem to manage." (Doc. 5-9, p. 12).  Dr. Berke changed Mr. Henderson's pain medication and observed that Mr. Henderson might need to go to a pain clinic again to see a pain psychologist who could teach Mr. Henderson biofeedback and relaxation skills.  Dr. Berke planned to follow-up with Mr. Henderson in one month to see if the new prescription pain

medication was helping Mr. Henderson and to decide whether Mr. Henderson would also benefit from treatment at a pain clinic.  (Doc. 5-9, p. 12).

The ALJ did not mention Dr. Berke's records in his opinion.  This may be because Dr. Berke examined Mr. Henderson approximately 15 months after September 11, 2011, the date on which Mr. Henderson was last insured.  Therefore, Dr. Berke's report is "relevant only for the light it sheds, if any, on [Mr. Henderson's] condition as it existed" on September 30, 2011.  *Anderson v. Schweiker*, 651 F.2d 306, 310 n.3 (5th Cir. Unit A. July 1981).[1]  It is not clear from Dr. Berke's report whether he believed that Mr. Henderson had suffered the same degree of pain for years or whether he determined that Mr. Henderson's pain had worsened over the years.  Moreover, the administrative record contains no other medical records from Dr. Berke, so the ALJ would not have been able to determine whether the adjustment that Dr. Berke made to Mr. Henderson's prescription medication relieved Mr. Henderson's pain.  Consequently, Dr. Berke's belated diagnosis (for purposes of Mr. Henderson's application) is not sufficient to cause the ALJ to adjust his assessment of the PCE and CAP evaluation forms that Dr.

---

[1] *Anderson* is binding in the Eleventh Circuit.  *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (explaining that the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981).  Disability insurance benefits claimants "must show that they were disabled on or before their last-insured date."  *Mason v. Comm'r of Soc. Sec.*, 430 Fed. Appx. 830, 831 (11th Cir. 2011) (citing *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

Sykes completed after Mr. Henderson's last-insured date and nearly one year before Mr. Henderson visited Dr. Berke.

> **B.    The ALJ properly evaluated Mr. Henderson's subjective complaints of pain.**

"To establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test by showing '(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.'" *Zuba-Ingram v. Commissioner of Social Sec.*, 600 Fed. Appx. 650, 656 (11th Cir. (2015) (quoting *Wilson v. Barnhart,* 284 F.3d 1219, 1225 (11th Cir. 2002) (per curiam)). A claimant's testimony coupled with evidence that meets this standard "is itself sufficient to support a finding of disability." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (citation omitted). If the ALJ discredits a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so." *Wilson,* 284 F.3d at 1225. "While an adequate credibility finding need not cite particular phrases or formulations[,] broad findings that a claimant lacked credibility . . . are not enough. . . ." *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995) (per curiam).

In this case, the ALJ summarized Mr. Henderson's testimony. (Doc. 5-3, p. 21). The ALJ then properly recited the pain standard and found that Mr.

13

Henderson's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms." (Doc. 5-3, p. 21). The ALJ also articulated adequate reasons for rejecting Mr. Henderson's testimony about the severity of his pain.

At his hearing, Mr. Henderson testified that he could not work because of phantom limb pain, PTSD, anxiety, and sleep apnea. (Doc. 5-3, p. 38). Mr. Henderson explained that the burning associated with his phantom limb pain "never stops. It never. It never lets down, and it's worse in the wintertime because it's very sensitive to hot and cold." (Doc. 5-3, pp. 38-39). According to Mr. Henderson, taking a shower is painful, and "it hurts to lift my arm. Any kind of movement or lifting. It's very, it's very hypersensitive to touch." (Doc. 5-3, p. 39). Mr. Henderson testified that his pain is "constant" and averaged an eight on a ten point scale. (Doc. 5-3, p. 40). Mr. Henderson stated that he spends about six hours a day lying on the couch because he "hate[s] to move." (Doc. 5-3, p. 42). Mr. Henderson testified that his medication provides little relief. (Doc. 5-3, pp. 39-40).

When evaluating a claimant's subjective symptoms, the ALJ may consider: (1) the claimant's daily activities; (2) the nature and intensity of pain and other symptoms; (3) precipitating and aggravating factors; (4) effects of medications; (5) treatment or measures taken by the claimant for relief of symptoms; and (6) other

factors concerning functional limitations. *Moreno v. Astrue*, 366 Fed. Appx. 23, 28 (11th Cir. 2010) (citing 20 C.F.R. § 404.1529(c)(3)). With respect to Mr. Henderson's subjective complaints, the ALJ explained:

> In terms of the claimant's alleged disability, the undersigned points out that the claimant's treatment records document that he was hospitalized for five days following his initial injury, then attended physical therapy and was discharged in June 2006. Since that time, and through his date last insured, his pain has been managed by medication and his activities were not significantly compromised. For example, he met a woman on the internet, traveled to the Philippines on two separate occasions for extended periods of time, and was recently married to her. He lived alone during the entire relevant period until his wife arrived in the United States. He was independent in all activities of daily living and remains so – personal care, cooking, driving, housework, shopping, paying bills and handling household finances . . . . Further, he reported that he was able to manage his pain to such a degree that he could travel alone and stay for multiple weeks outside of the United States. He has effectively managed his workers' comp settlement to the degree to be able to live off of it for several years. While he does not use his prosthetic, he learned how to use it and had, through occupational therapy wherein he learned to be proficient with his non-dominant left hand and again, live independently. His physical examinations, with the exception of the amputation, have been essentially unremarkable. Pain Management's records reflect that his pain was controlled by medication. Records obtained from Dr. Sykes indicate continuation of pain control without report of any findings or concerns about the impairment caused limitation of function, including traveling abroad. The claimant's depression and anxiety appeared to be nothing more than situational, and not chronic, acute, or requiring anything other than occasional medication. While he has had some mild problems and additional medical treatment after his date last insured, there is nothing to suggest that they were the result of any significant, undiscovered problems existing through his date last insured.

(Doc. 5-3, pp. 21-22).

15

The ALJ found that Mr. Henderson's complaints of pain were not credible in light of his daily activities, ability to travel, and relatively conservative treatment history. Substantial evidence supports the ALJ's adverse credibility finding. *See e.g., Moore*, 405 F.3d at 1212 (substantial evidence supported the ALJ's credibility determination where the ALJ questioned the claimant's contention that she could not perform light work "in light of her ability to drive, provide childcare, bathe and care for herself, exercise, and perform housework"); *Crow v. Comm'r of Soc. Sec. Admin.*, 571 Fed. Appx. 802, 805, 808 (11th Cir. 2014) (substantial evidence supported ALJ's adverse credibility finding where the claimant's "treatment was largely medication management, with few, if any, recommendations for more aggressive treatment"; the claimant's treating physician did not indicate any significant physical limitations; and the claimant testified that he "had no personal care issues, and was capable of driving and shopping at least once a week").

## V. CONCLUSION

For the reasons discussed above, the Court finds that the ALJ's decision is supported by substantial evidence, and the ALJ applied proper legal standards. The Court may not reweigh the evidence, and the Court may not substitute its judgment for that of the Commissioner. Accordingly, the Court affirms the Commissioner. The Court will enter a separate final judgment consistent with this memorandum opinion.

**DONE** and **ORDERED** this July 30, 2016.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE